149 So. 356

ROBERTS v. STATE.

7 Div. 954.

Court of Appeals of Alabama.
June 30, 1933.

C. J. Scott and C. A. Wolfes, both of Fort Payne, for appellant.

Thos. E. Knight, Jr., Atty. Gen., and Jas. L. Screws, Asst. Atty. Gen., for the State.

**BRICKEN, Presiding Judge.**

The indictment contained three counts, each count charging this appellant and her 16 year old son with the offense of murder in the second degree. Count 2 was charged out by the court, and properly so, as there was no evidence in the case to sustain the material allegations of said count. A severance was granted, and this appellant, Willie Roberts, a woman, was put to trial on counts 1 and 3 of the indictment, wherein she was charged with killing J. W., alias William, alias Shorty, Roberts by choking him with a rope (first count) and by strangling him with a rope, in the third count. The deceased named in the indictment was the husband of this appellant, and the stepfather of her son, Albert Woods. The evidence disclosed they had been married about 3 years and lived together during that period as man and wife. The jury returned a general verdict of guilty as charged in the indictment, and fixed her punishment at imprisonment for 10 years, whereupon the court duly sentenced her to imprisonment in the penitentiary for 10 years in accordance with the verdict of the jury. From the judgment of conviction thus pronounced and entered this appeal was taken.

■ Appellant's first insistence of error is the action of the court in overruling her objections to testimony of witnesses as to a purported confession made by her. This on the grounds that the corpus delicti had not been proven at the time this testimony was offered by the state and allowed by the court. It is the law that the corpus delicti must be established independently of the confession of the accused; and in the case at bar we are of the opinion that this rule had been sufficiently met by the evidence adduced. The testimony of the examining physician, coupled with ample other evidence, all without dispute, in our opinion established the corpus delicti. By this evidence it was disclosed that the body of Roberts (the deceased named in the indictment) was found tied in a sack and hidden in cotton seed in his barn; and his hands were tied in front of him, and a towel around his neck. There was ample evidence to sustain the physician in his statement that his death was due to strangulation. There were marks of violence on his face and neck which, in our opinion, also tended to establish the fact that his death was not the result of accident, natural causes, or by suicide, but could only have been caused by the acts of another. Moreover, if it should be conceded that evidence of her confession was inadmissible when offered, it cannot be questioned that it was rendered admissible by subsequent evidence adduced, and, where this is true, even if error prevailed primarily, it would be cured. Carr v. State, 17 Ala. App. 539, 85 So. 852; Tarwater v. State, 16 Ala. App. 140, 75 So. 816; Rollins v. State, 18 Ala. App. 354, 92 So. 35.

■ There was no error in the ruling of the court in allowing the state to offer evidence relative to the odor about the body of deceased at the time it was found in the cotton seed. This evidence not only related to the locus, but was also admissible as corroboratory of the testimony of the physician that the homicide had occurred some 3 days before he was called in to examine the body. We cannot accord to appellant's insistence that "this evidence could only serve to prejudice the minds of the jury against her."

■■ Appellant contends there was a variance in the indictment and the proof as to the name of deceased, and that error is thus shown. An indictment charging the offense of murder must be so certain as to the party against whom the offense was committed that the person indicted may know and understand whom he or she is charged with having killed. Page v. State, 61 Ala. 16. But, as stated in Langston v. State, 8 Ala. App. 129, 63 So. 38, 39, "It cannot be said, as a matter of law, that this is always best accomplished by stating" the true name of deceased. "He may be as well, if not better, identified by a name by which he was generally known and called, though that was not his true name." The wisdom of this rule is manifest by the testimony in this case. The deceased was here named as J. W. Roberts, alias William Roberts, alias Shorty Roberts, and it conclusively appears that he was known in this state only by the names averred in the indictment. He was known and called "William" or Shorty Roberts by everyone during his 3 years of living in this state, and during this period he was never known or called otherwise. If, as a matter of fact, as some of the testimony tends to show, he was known and called by the name of William Newton Tyler, or by W. N. Tyler by the people who knew him in Oklahoma, the state where he formerly resided, it would be wholly immaterial here for the reasons stated. He was never known or called Tyler during his sojourn of about three years in this state. Therefore this insistence cannot

avail this appellant, and the trial court properly so ruled.

As stated, this appellant was the mother of her coindictee Albert Woods, age 16, her son by a former marriage. It appears that the difficulty resulting in the death of deceased was between this boy and deceased, and her insistence is she was acting in defense of her own child. Her version is best stated in her own language when testifying in her own behalf. In this connection she had this to say: "The first thing that happened that morning out of the ordinary was he woke me up early about four o'clock or before because our clock was fast and told me, he said, 'Willie lay your head on my arm, this will be the last time you will ever lay your head on my arm' and I asked him why he talked that way and he said, 'I am going away' and so I called my boy Albert and told him to get up and get a fire started, and we did not say any more after I asked him what he was going to do, so I told my boy to get up and to make a fire and we got up and was getting breakfast and got through with breakfast and came into the fire place to the fire and he just turned around to Albert and says, 'If I was as lucky as you are I would not be living in two hours' and Albert got up and started across the room toward the fire, he was sitting over there and William was over here (indicating) and he just got up and shoved Albert across the bed and was on top of him cutting him with a knife and I saw the rope across his shoulder and I first grabbed his shirt and tried to pull him off and I couldn't and I saw that rope and I just threw it over his head and jerked him backward into the floor; he cut me in the back and then cut me in the leg and I kept holding on to the rope, I was scared so bad I don't know what was going on, and he runs out through the kitchen and dining room and on toward the barn. I was holding to the rope, I did not know what else to do; and got in front of the barn gate he went down and I went down on the ground and when I came to myself I was holding to the rope and he was dead. I don't know how long he had been there. * * * When I put that rope around my husband's neck, I did not mean to kill him, I just meant to get him off my son, I could not get him off any other way. Doctor Gaines came there somewhere about seven or eight o'clock. I tried to get my folks and couldn't and they could not get to me and Mr. Coker is the one that did the telephoning, I sent Mr. Neal Spears to the valley to let some of my folks to know to come and help me. One of my brothers brought my Mother back. About four o'clock Wednesday morning went over to Mr. Coker's and had him call the officers. I told Mr. Coker all about it then. No one had hit my husband with a poker. Albert did not take up the poker near the fire place and strike my husband in the face, he was not about the fire place; neither I or any of the boys struck him the face with anything."

It is the law that a parent may defend the son and strike in his behalf, but this right is coextensive with the right of the son under the existing circumstances of the particular occasion to defend himself, and this right depends upon the same conditions as would be necessary to excuse the son under the plea of self-defense. Vaughan v. State, 21 Ala. App. 204, 107 So. 797. As otherwise stated in Karr v. State, 106 Ala. 1, 10, 17 So. 328, 331: "the right of a son to defend his father is coextensive with the right of the father to defend himself; and whatever the father may do rightfully in repelling an assault, actual or threatened, the son, coming to his assistance, may do rightfully."

It is insisted by appellant that deceased entertained ill will, hatred, and malice towards her children, and that the evidence in this case discloses this fact without dispute. Appellant also insists that deceased was the aggressor in the difficulty which resulted in his death, and that his attack with a knife upon her and her 16 year old son was without provocation, and as a result of the ill will and malice he held against the three stepchildren. In furtherance of this insistence, the defendant offered as a witness one Charlie Driskill, who testified that several days before the difficulty he had a conversation with deceased who stated to him "he was getting damn tired of keeping boarders; I asked him what he meant by that and he replied, 'I mean these damn boys here my stepchildren.'" He also said: "Me or my stepchildren one has to leave, we do not stay at the same place another year. I don't propose to put up another year with what I have put up with this year." And witness Clarence Stone testified: "I knew J. W. Roberts (deceased) and a few days before this trouble I talked to him. He said he wanted to know why they (the stepchildren) did not get some kerosene oil and they said they did not have the money to get it with and he said 'that is the way it always is, you depend on the old man for everything,' and said, 'It won't be long now till you will have to root hog or die poor;' he turned to me and said 'Me and them children can not stay under the same roof together.'"

The record shows: Thereupon counsel for the state moved to exclude all the foregoing testimony, the court granted the motion, and defendant excepted. Under the issues in this case, the defendant was entitled to the evidence thus excluded, and the court committed error in sustaining the state's motion to exclude. In the recent case of Lawson Newman v. State, 149 So. 724,[1] Samford, J., of this court, announced a well-settled principle of law peculiarly pertinent to the point

---

[1] Post, p. 526.

of decision above discussed, to wit: "In a prosecution for homicide evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestæ, in the sense that they become a part of the crime itself, but they are admissible where they throw any light upon the actions, animus, or intent of the defendant, and in this case the mental attitude of defendant [deceased here] at the time of the fatal difficulty as bearing on the question of freedom from fault and required by defendant's plea of self-defense becomes very pertinent"—citing Way v. State, 155 Ala. 52, 46 So. 273.

After an attentive, careful consideration of the entire record, we have reached the conclusion that defendant's motion for a new trial should have been granted.

For the errors indicated, the judgment of conviction from which this appeal was taken is reversed, and the cause remanded.

Reversed and remanded.

