17 So.2d 683

## RAINEY v. STATE.

### 7 Div. 703.

Court of Appeals of Alabama.
June 30, 1943.

Rehearing Denied Oct. 5, 1943.

Hood, Inzer, Martin & Suttle and L. B. Rainey, all of Gadsden, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Geo. C. Hawkins, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The appeal in this case is from a judgment, convicting the defendant (appellant) of manslaughter in the first degree, and also from a judgment overruling and denying the defendant's motion for a new trial.

The indictment against the defendant contained four counts, each of which charged him with having committed murder in the second degree. This indictment in its entirety, and each count thereof, was predicated upon the alleged reckless and wanton negligence of the defendant in driving his automobile against, on, into, or over Chester Heptinstall upon a public highway of this State leading from Gadsden, Etowah County, to Anniston, Calhoun County.

The scene of the alleged homicide was shown to be about three miles east of Gadsden, on said highway.

The record in this case is voluminous and the exceptions noted during the trial of the defendant are numerous.

Briefly stated, the uncontroverted facts are that on the night of November 10, or the very early morning of November 11, 1939, Chester Heptinstall, the deceased, was driving his automobile from a roadhouse, known as "Wright's Place," located on or near the above named highway, towards Gadsden. He was accompanied by J. C. Heptinstall, Ola Bagley and Vivian Keeling. At this time Chester Heptinstall and Vivian Keeling occupied the front seat of the automobile and J. C. Heptinstall and Ola Bagley occupied the rear seat thereof. After Chester Heptinstall had driven his car a short distance from the above roadhouse going towards Gadsden on the above highway, he stopped the same on the right hand side of the center line of said highway for the alleged purpose of changing drivers. With the head lights of the car on and burning the left hand wheels of the car are said to have been about three feet to the right of the center line of said highway.

After Chester Heptinstall had thus parked his automobile in the highway he alighted therefrom by way of the left front door (the front door nearest the center line of the highway). J. C. Heptinstall got out of the automobile by way of the rear right door of said car. Vivian Keeling got out of said car by way of the right front door thereof. Ola Bagley, according to her testimony, was attempting to get out of the rear left hand door of said automobile when it was hit by another motor vehicle, and when she was hurt by the impact. Where Chester Heptinstall, the deceased, was at the time the motor vehicle which struck the Heptinstall car was approaching, or when it struck the Heptinstall car, the testimony does not show. Ola Bagley, herself, testified that at this time she did not know definitely where Chester was; that he was out from under the driver's seat and that J. C. Heptinstall was out from the back where he had been riding. A short time after the Heptinstall car was struck, or sideswiped, by the other motor vehicle, and after it had passed on, the body of Chester Heptinstall was found wounded and broken lying some 65 feet to the rear of the Heptinstall car just on the right edge of the pavement of said highway.

Where J. C. Heptinstall was at this time the testimony does not show. Ola Bagley testified that while she was attempting to alight from said automobile by the left rear door she saw the headlights of a motor vehicle coming from in the direction of Gadsden and going in the direction of Wright's Place, and that said motor vehicle was traveling rapidly and that it came straight on and struck the Heptinstall car, hurting and wounding said witness on the thigh and hips. She testified that the car was evidently running 65 miles an hour and that after striking the Heptinstall car it went straight on, without stopping.

After Ola Bagley was assisted to the front of the car by Vivian Keeling, J. C. Heptinstall called her and she went to him, and from where J. C. Heptinstall was at that time (her testimony does not show but

from this spot) she saw Chester Heptinstall's body lying on the edge of the pavement as above stated. She did not locate J. C. Heptinstall's position, or which side of the highway it was on.

It had been raining off and on after ten o'clock that night. Kenneth Rainey, appellant, accompanied by Lester Simmons and Bob Owens, was driving his Ford automobile from Gadsden to Wright's Place on the above named highway that night. These three men were sitting on the front seat of said Ford car. The windshield wiper on the Rainey car was not in working order at this time. It had gotten out of repair during that night. The Rainey car, being driven by Kenneth Rainey, and traveling at a rate of speed of from 40 to 45 miles per hour as testified to by him and Lester Simmons, and through a downpour of rain, met a motor truck which crowded the Rainey car in passing; after passing the Rainey car they saw the headlights of another motor vehicle which appeared to be approaching them. This motor vehicle appeared to be a truck with something hanging out of the body thereof, or leaning against the same. The defendant testified that he was blinded by the lights of the motor vehicle which they were approaching. As to this Lester Simmons, who testified as a witness for the State, testified that he and Bob Owens went out from Gadsden with the defendant in the defendant's automobile, all three of them sitting on the front seat, and that while they were driving out to Claude Wright's Place, they had an accident about two miles out from Gadsden, and as to this we quote from his testimony: "That when he first saw what he took to be a truck ahead of them, the lights from that car, the other car, were shining in their faces as they approached it; that when he saw the door hanging out they were right up on it; that they were then about 10 feet away when they saw and realized the door was standing open out in the highway; at which time the defendant was still driving his automobile from 40 to 45 miles per hour; that when they reached that point, with the head lights shining in their eyes, witness saw the object hanging on the outside of the door, outside of what he took to be a truck, at which time the witness told the defendant it looked like a man hanging on the bed of the truck, at which time they were right up on him. Witness did not think defendant made any reply to that remark; he did not remember."

The witness was here asked, "Did he hit that object there that you saw?" The witness replied, "Well, he just sideswiped the fender of the car." Continuing, the witness testified: "That they did not hit the object, so far as he could see that was hanging out on the outside of what he took to be a truck; that at that time defendant was going about Forty or Forty-five miles per hour; that at that place defendant's car did not run over any object; that the front wheel of defendant's car did not get up on the running board of the truck, or other car; that it did not go up from the ground in any way as they passed by; it went right along the ground * * * that he did not see a man out there, that they did not hit or strike a man, or run over one that he knew of; that as they were passing the other car, which he took to be a truck, if defendant's car struck a man or run over one, he did not know it; did not see it, or feel it."

Mr. Robert L. Owens, the third man who was in the Rainey car, was not present at the trial of the case because of his service in the armed forces of the United States. His depositions were taken. According to Mr. Owens' depositions which were read as testimony for the defendant at the trial, Rainey, Simmons and Owens were all on the front seat of the Rainey car while they were driving from Gadsden towards Wright's Roadhouse on the Gadsden-Anniston Highway; that the night was dark, rainy and stormy, and that there was a driving rain or a downpour; that when they reached a point about three miles out of Gadsden they ran into heavy traffic and sideswiped a car; that they went on about a hundred yards where they stopped and pulled the fender up off the front wheel of the Rainey car; that at the time of the collision the witness felt a slight jar, that it felt like something dragging on the wheel.

There is no positive proof in this case that the deceased, Chester Heptinstall, was killed or injured by the impact of the Rainey car when it sideswiped the Heptinstall car. The only person injured at that instant, in so far as testified to, was Ola Bagley.

The State offered evidence tending to show that the Assistant State Toxicologist examined the Rainey car on the day fol-

lowing the collision between the Rainey car and the Heptinstall car. This examination was made several hours after said collision and at a different place. As a result of said examination some hair, cloth fibers and a small piece of human tissue were found on the running board and windshield cowl. of the Rainey car. These cloth fibers matched the cloth fibers of the clothing worn by Chester Heptinstall at the time of his death. The strands of hair were identified as being in all respects identical with strands of hair taken from the head of Chester Heptinstall, the deceased. The small piece of human flesh, about the size of a pea, was not—and could not be—identified as having come from the body of the deceased.

Counsel for defendant make the insistence that it does not necessarily follow that the finding of the strands of hair, the cloth fibers, and the particles of human flesh upon the running board of the defendant's car shows that Chester Heptinstall was struck down by the defendant's car. That Chester Heptinstall was not standing by his automobile at the time it was struck by the Rainey car is clearly established by the testimony of Ola Bagley, who was then, according to her testimony, getting out of the Heptinstall car into the line of travel of the Rainey car as it approached. It is argued that if Chester Heptinstall had been there by the side of his car she must necessarily have seen him and must have known of his location. She swears that she did not definitely know where he was at that time. The evidence further shows that the Heptinstall car was not moved from its original position in the highway by the impact of the Rainey car. Yet the body of Chester Heptinstall was found 65 feet to, the rear and slightly to the right of his car, as he left it standing in the highway. The evidence tending to connect the Rainey car with the striking of Chester Heptinstall was the finding of the hair, cloth fibers and piece of flesh on the running board and windshield cowl of the Rainey·car. The argument is further advanced that the hair, the cloth fiber and the piece of flesh all may have been splashed up from the wet pavement upon the Rainey car and that in the light of all the testimony it is not an unreasonable inference to say that the hair, cloth fibers and piece of flesh reached a lodging place upon the running board of the Rainey car from some means, or cause, other than by the deceased being struck down by the

Rainey car. But be that as it may. There is no evidence in this record showing or tending to show that the defendant knew the deceased prior to the death of the deceased or that there had ever been any association, of any kind, between the defendant and the deceased, or any of the other occupants of the Heptinstall car. Further, there is no evidence in this record showing or tending to show that the defendant intentionally drove his automobile against, upon, over, or into the deceased.

It is insisted by the State that if the defendant drove an automobile so recklessly along a public highway and in such manner as to endanger human life, and death resulted, the act would be manslaughter in the first degree, whether the party's intention to kill was proven or not.

■ There is a distinction and a difference between negligence and wantonness which has been recognized both by our Supreme Court and this Court. Law v. Saks, 241 Ala. 37, 1 So.2d 28; Lay v. State, 26 Ala.App. 458, 162 So. 319; Willis v. State, 29 Ala.App. 365, 197 So. 62.

In the Willis case, supra, this court, after due consideration, declared that wanton injury must be predicated upon actual knowledge of another's peril, and a failure to take available preventative action, knowing that such failure will probably result in injury. Copeland v. Central of Georgia R. Co., 213 Ala. 620, 105 So. 809, 810.

■ In the Willis case, supra, we also declared that actual or probable danger to some person must have existed as a matter of knowledge and present consciousness, or that which in law is the equivalent thereof, upon the part of the driver to constitute reckless and wanton negligence in the driving of an automobile.

■ After a due consideration of this record we are of the opinion, and hence we declare, that there was an entire want of competent and legal evidence, introduced upon the trial of this case in the court below, to show that the defendant was guilty of intentionally running his automobile against, or onto, or into, or upon the deceased, or that he was guilty of such recklessness and wantonness in the operation of his said automobile as to justify his conviction of manslaughter in the first degree.

The State's witness, Lester Simmons, was asked if the defendant, in approaching

what proved to be the Heptinstall car, turned from the line he was traveling from, or if he turned his car in either direction. The witness answered, "It all happened so quick I don't remember. We tried to dodge it, I know, and I closed my eyes and braced myself."

It is therefore the opinion and judgment of this court that the trial court erred in refusing to give at the request of the defendant his written charge No. 4 to the effect that under the evidence the jury could not convict the defendant of manslaughter in the first degree under any one of the several counts in the indictment.

Without further discussion it is also the opinion and judgment of this court that the trial court erred in overruling defendant's motion for a new trial, both upon the ground of newly discovered evidence as well as other grounds noted in said motion.

The errors hereinabove pointed out were highly prejudicial to the defendant and the judgment of the trial court is therefore due to be reversed and this case remanded for another trial. It is so ordered.

Reversed and remanded.